Thank you, Your Honor. May it please the Court, Steve Berman on behalf of the appellate. The appellate submits that there was plenty of evidence in the form of deposition testimony, unrebutted expert testimony, EquiTrust's own documents, from which a reasonable juror could conclude that there was an unlawful scheme at issue in this case. And we submit that every court, except for one, that has considered facts like these have ruled in favor of the plaintiffs in that case. Have those courts looked at this precise nature of annuity? I see courts dealing with a two-tiered annuity and various types. What courts dealing with this kind, this precise kind of annuity, have found an unlawful scheme? The court in the Grett case and the eOrio case addressed identical mechanisms, the bonus mechanism and the market value adjustment. In the context of the same type of annuity? No, those were interest annuities. Right, right. Yeah. And that's why I'm asking. Has any case ever addressed the precise facts of this case? No. But I don't think that difference matters in this case for the following reasons. First, I'd like to start with the bonus scheme, as I call it. Of course, EquiTrust promised a, quote, premium bonus. And I was thinking in argument today, and we should have put in our briefs, but I went to some dictionaries to figure out what bonus means in the ordinary meaning. I went to Black's Law Dictionary. Black's defines bonus as, quote, extra consideration. The Merriam-Webster Dictionary defines bonus as, quote, something in addition to. So I think a reasonable person, based on ordinary definitions, would think that bonus means something in addition to. Didn't the law say in the dictionary, quote, something in addition to, and I read the promise here was that if you buy this annuity and put in $10, we will put in an extra dollar, and that will go to your accumulation base, and all interest later will be paid on that. Isn't that exactly what happened? No, Your Honor. What happened in this case, it really is unrebutted. And I'll just keep going. Well, but tell me where I'm wrong. I read the facts. I read the facts of this case. I read the record. Mr. Harrington put in a certain amount of money, say $400,000. That's right. And 40 more was credited to his account by the company. And then when the withdrawals were made, the basis of those withdrawals were as if he had an account of $440,000 rather than an account of $400,000. Correct? No, that's not correct. Where am I wrong? You're wrong in that in later years, after the first year, the company begins to recoup the bonus. No, I don't care how they make money. Put aside how the company makes money. I want to know what was promised to Mr. Harrington that wasn't delivered. That he would get an extra 10 percent. Didn't he? He did not. Why not? Because over the years, there's a recoupment process where in the bonus the recoupment process doesn't reduce his accumulation basis, does it? It takes it back down and wipes out the 10 percent. How does it do that? Because he's credited with less interest. Oh, but that's not what I asked you. I asked you, wasn't he before the 10 percent credited to his account and didn't he receive, he made a withdrawal, a payment on the basis of having an additional 10 percent in his account? He made a withdrawal. He was entitled to withdraw 10 percent. What you're saying is had he bought a different annuity without the bonus, he might have gotten a higher interest rate, correct? That is correct. So that's so tell me why the presence of a different annuity that might be better for different people makes this one fraudulent. Because you didn't tell the consumer. Let me give you this analogy. But the whole description was fully disclosed, was it not? There was nothing hidden. Here's what's hidden. Let me give you a question and answer. Question. This is at ER2015. And this disclosure statement does not inform the prospective policy applicant that the company will recoup the bonus. Because when you say recoup the bonus, what you really mean is that they had, had he bought a different product from the company, had they offered a different product, and they did, in that product, the interest rate would have been higher, there wouldn't have been a bonus, and if you held on to the annuity long enough, that might be a more profitable annuity, right? What they didn't tell, that is correct. Okay. So why, why did they have a duty to tell somebody who's buying an annuity, we have a different product that may be better for you, but it may be worse? Because once they spoke the words, we're giving you a bonus, they had a duty to speak the full truth. Let me give an analogy. I was thinking about it this morning. I have the task of, of giving bonuses to folks in my law firm at the end of the year. So if I say to someone, here's your bonus of $1,000, what would they say to me if next year I lowered their salary to recoup that bonus? But they didn't lower the interest rate in this case. They did. He was promised an interest rate at a cap or above. How far above he went was, when he got into it, he knew it was at the discretion of the, of the company, correct? That's correct. And so, and they did sell other products, I think, with a higher cap. Because that didn't have the bonus provision, correct? That's correct. And what you're really saying is they had some sort of duty to tell him that this product, which has a 10 percent bonus, may over the long run be less profitable for you than another product, depending on market conditions and, and your desires, correct? That's not what they should have told him. What should they have told him? What they should have told him is that the bonus is not really a bonus. That the bonus is going to be recouped so that at the end of the day, there is no bonus. It's a momentary, notational, arithmetic. But wait. Now, if he died, Mr. Harrington died tomorrow, wouldn't he get a payment based on the account including the bonus? If, in the limited circumstance, that if he died early, he would get some form of a bonus. And if he wanted to make continual withdrawals off the account, wouldn't the bonus be the basis on which those withdrawals were made? Well, no, because ultimately, according to the admissions of Equitrust's own agents, here's ER-1803, the bonus, and I'm quoting now, the bonus is financed by the customer in the form of reduced annual value. Well, but that's not the question I asked you. The question I... I didn't get the last. A reduced... Reduced annual value. So the company is looking at each account and saying, we're going to get that bonus back, we're going to reduce your annual value until we do. Well, but they're not reducing his actual accumulation basis, are they? Well, they are, because they're giving him lesser interest... Well, I... And, you know, we can characterize. I'm just trying to get a fact here. So tell me where I'm wrong with the facts. His accumulation basis increases by 10 percent when the bonus is put on, correct? Correct. And then for purposes of withdrawing on an annual basis or for purposes of your account growing over time, that 10 percent not only remains, but whatever interest rate that's applied each year is applied against the account, plus that 10 percent, and it compounds over time, correct? That's correct. Okay. Now, what you're saying, and it may be a good argument, but I just, we shouldn't fight about words. What you're saying is that the company makes its profit over time by paying less interest on this account than it might have on another account with a bonus in it, correct? That's correct. And, okay, so my question, this is one I asked before, is tell me why they have a duty to say to somebody who buys this account... There's another account that we don't give a bonus on. We have a higher interest cap on that one. You won't be able to withdraw money as quickly on it. If you live long enough, that other one will be better for you. Why, from whence does their duty to inform them of alternative annuities arise? Because I think anyone who hears the word bonus believes, an ordinary juror would believe, that that means something in addition to what you're offering me. It does not mean that you're going to take it back over time. And having used the words bonus, I think they had a duty to speak the full truth, which is... So that I understand you, when you say take it back over time, what you mean is that in their discretion they will provide a lower rate of interest on this account than they might have on another account without a bonus? Yes. Okay. They have discretion, I agree, to give you a different interest rate, but they always exercise that discretion to take away the bonus eventually. And Mr. Dillinger, unrefuted, has gone year by year through Mr. Harrington's account and shown how much extra they've recouped year by year. So the very first year, they recouped 800 additional dollars. You're not contending there was some sort of fiduciary duty in this case, are you? No. So your argument on this turns on the notion that the word bonus is misleading given this set of facts. That's correct. Okay. And I submit that although the mechanisms might be a little different annuities, the lower courts that have addressed this bonus issue have found that it is misleading in these circumstances. The only court that found it was not misleading was the Kennedy court. And in the Kennedy court, in the very first paragraph where they ascribe the bonus, in big, bold letters, they say we're going to recoup this amount by giving you less interest over time. And that's what the defendant did not do here. They didn't disclose, and it's unrefuted, that they were going to recoup it. And we think that under the law, when you speak a truth, you have to speak the full truth, and that was not done here. Let me turn to the other, there are other elements of the scheme at issue here. Let me just mention one, and that's the market value adjustment. And since my time is short, I'll make one point on that. We call that a bias. The term bias means, again, looking at dictionary use, it means prejudice. And the prejudice here is the formula always works against the policyholder. Now, the Court said, well --" Scalia, again, I come back to my earlier question. The method by which the insurance company makes its profit shouldn't really affect this issue so long as there's full disclosure. And wasn't this method and the formula, even the .5, all of that was revealed, was it not? And the formula was revealed. But I submit to you, it would take a mathematician. And if you look at Mr. Dillinger at ER 2347 to 2348, where he goes through the math and shows what the .5 does, an ordinary consumer is not going to be able to do that. And, in fact, the one case that went to trial on this, where a trial court in the Stevens case actually heard all the evidence, said a normal consumer would never be able to figure out the way this calculation works. Another way to emphasize that point, the term bias --" Therefore, that is an affirmative misrepresentation? Is that your --" It's misleading. It's a half-truth. Because you went and you described how that formula worked. And the promise was it decreases accumulated value when interest rates rise and increases accumulated value when it falls. And what you didn't tell the consumer, it always takes more out for the insurance company, no matter what, whether it rises. Where's the affirmative misrepresentation here? The affirmative misrepresentation is that there's a decrease in value in certain circumstances and an increase in others. That's true, is it not? It is a partial truth. Well, it's a complete truth. There is an increase and a decrease. The increase and the decrease may be not as great as you might like, but it is the truth, isn't it? Well, it is truth, but it's a half-truth. Because you're not telling the consumer that there's a material bite being taken out of you, no matter which way it goes. So where's the representation to the contrary? What you're saying is the representation was there's an increase in some circumstances and a decrease in some others. And that's true. Where's the representation to the consumer that the increase is slightly less than it would have been had we not put this bias into it and the decrease is slightly less? It's not there. And in fact, the point on this is the term bias is not my term. It's the company's internal term. They recognized that the formula had a bias. They called it that. And I submit, if you're going to disclose a formula to a policyholder, an elderly person trying to decide what to invest in, you've got to tell them this formula has this bias, and then you can make a decision, do I want this product? I see I have a minute 30 left, and I'll just reserve. If you'd like to reserve, you may do so, counsel. Thank you. Good morning, Your Honors. Margaret Grignot for Equitrust. Mr. Harrington brings this action, claiming a scheme under RICO. But there are no tribal issues of fact with respect to any of the RICO factors. There are no tribal issues of fact with respect to a scheme or intent to defraud, not with respect to whether or not there's a separate and distinct RICO enterprise. There are no tribal issues of fact with respect to whether there is any concrete financial injury. And finally, there are no tribal issues of fact with respect to whether there's any causation of injury. This is a case where Mr. Harrington purchased a deferred equity insurance contract. And in that contract, in exchange for Mr. Harrington's premium, Equitrust promised to make certain payments under certain conditions. Everything that Equitrust promised was given to Mr. Harrington. The premium was credited into the accumulation account. The 10 percent premium bonus was credited into that account. When the index that he selected tanked over the next two years, 16 percent in one year, 27 percent the next year, he lost not a penny of either his initial premium or the premium bonus. That's because of the floor, in effect. Yes, Your Honor. It's actually ---- You call it a cap, but it's really a floor. It's because he can't lose. In other words, it's not the caps. The cap caps the increase. Right. But he can't lose money. So let me ask this question. If Mr. Harrington had invested in a different annuity, and I take it you offer annuities without the bonus? Yes, Your Honor. How quickly would that other annuity have been a better deal for him? Your Honor, there's no way of telling from this record. There are many different annuities. They all have different options and provisions in them. And you will notice in the record that there is not anything in the record which describes this product in connection with a nonbonus. Is there anything in the record that reflects representations made by sellers of the product to Mr. Harrington other than the brochures and the written materials? There is nothing in the record to that effect. So there's nothing here where somebody said to him, this is the best deal we have or this one will work better than other annuities for you, things like that? Nothing like that, Your Honor. This entire case is based on the disclosure that Equitrust gives to the purchasers through the agents and then the annuity contract itself. One other thing you could help me with in this case, because I've tried to read the other cases dealing with various different types of annuities and I'm not sure I understand them all. I'm like the consumer. Is there any case that deals with this set of facts that finds that it is a RICO violation? There are no cases that are identical, Your Honor. What's the closest? I would say the closest is Cervo Ceto, but it's not a RICO case. And that same analysis is applied in the Kennedy case, which is a RICO case. So the combination of those two cases. The Kennedy case does have the. Has the language that says we're going to recoup, in effect, our we're going to recoup the bonus by giving you a lower rate of interest over the years. Well, it doesn't exactly say that, Your Honor. It says that a non-bonus product may pay a higher discretionary interest rate. Right. So why is that a critical fact in Kennedy? Why isn't that a fact that distinguishes Kennedy from your case? It certainly is a fact that distinguishes it, Your Honor. But that's not exactly the argument that they're making. The argument that the plaintiff is making here is not that there should be a disclosure that there are other products that might pay interest in a different way. They're arguing that there's some obligation to disclose to the purchasers, or the potential purchasers, the internal pricing mechanisms and accounting methodologies that allow Equitrust to actually make a profit in this case. And all of the cases, starting with the Nice Circuits case in Thorman and other cases dealing with internal pricing mechanisms, make it clear that there is absolutely no obligation to disclose that to purchasers. What you need to disclose to purchasers is exactly what's going to happen to them. That's what happened here. And Mr. Harrington got everything that was promised to him. So there is no fraud at all in this case. Could you address the market value adjustment? My law clerks understood it because they're smarter than I am, but I didn't. I understand that it works precisely the way the formula goes. But is what – how would a consumer buying this – and I understand we don't have a consumer fraud argument in this case. How would a consumer buying this understand what was going to happen? Well, Your Honor, the consumer is informed that depending on interest rates, there's going to be a market value adjustment which will affect the surrender value in the policy. I should point out in this case that 89 percent of the market value adjustments in this case were positive for the policyholders, netting $88 million. So this market value adjustment in this policy was overwhelmingly positive for the policyholders. But what they're told is that there's a market value adjustment, that it depends on treasury rates, it depends on whether interest rates go up or down. There isn't any way that the average consumer is going to be able to figure out precisely what that means. This adjustment only is applied in the event of some sort of early termination of the annuity? Exactly, Your Honor. It only applies if there is a premature surrender. And, of course, Mr. Harrington had no premature surrender. He did not incur any surrender charges and he did not incur any market value adjustments. So in this particular case, it has no effect whatsoever. What I'd like you to hear your response to Mr. Harrington's argument that it's misleading because they're not told of this internal bias that, in effect, is another profit center for the insurer, right? The .005 number is, of course, in the formula. Right. And so it is fully disclosed. There's also an example in the separate market value adjustment disclosure that Mr. Harrington signed. So, in other words, he had one disclosure. He signed a separate market value adjustment disclosure. There's an example in there which shows that the effect of the .005 factor. When you have a 1% increase or decrease, the change is dramatically different depending on whether it's an increase or decrease in the interest rate. Does the bias, if I can call it that, ever make the basic statement that when interest rates go up, it increases, or interest rates go down, it decreases, or the other way around? Does it ever make that statement incorrect? It does not. It says, Your Honor, in both disclosures, it says that generally when interest rates increase, the market value adjustment has a negative impact, and when interest rates decrease, the market value adjustment. And I guess I was asking, is there ever a circumstance where if market rates decrease, you won't get an increase with the market value adjustment or the other way around? There's never a situation. In other words, do the lines ever cross, given the .005, and therefore make the statement misleading at any point? If my question is correct. I do understand your question. I'm not certain that I know the answer to it. Okay. I couldn't figure it out mathematically, but I wondered whether or not because of the bias, there was some circumstance where if market rates went down, you still didn't, you didn't get an increase at all, or if market rates went up, you didn't get a decrease at all. I'm loathe to answer that question because I'm not a mathematician. Okay. I'll get it wrong. That's his point, I think. I'm not certain, I'm not certain, Your Honor, that there's any way to disclose the market value adjustment. There's no evidence in this record. No evidence in this record that's the case. I've looked sort of carefully in the record, but I just didn't know whether that was mathematically a possibility. Anything further, counsel? Your Honors, I'd like to talk for a moment about the enterprise aspect of this case, if I could.  at this time. If we agree with you with respect to affirmative misrepresentation, then we don't reach that issue, is that correct? That's correct, Your Honor. And so perhaps I don't need to go into it. Well, it's your choice, counsel. I'll just say briefly that in this case, there are no allegations of a separate and distinct enterprise, and the reason for that is because all that's been alleged and all that's been established is that Equitrust sells its deferred annuities through independent agents and brokers, and that they give the independent agents and brokers a disclosure statement, and they use that statement in order to sell the annuities. But the law is clear that RICO is not violated every time two or more persons get together and allegedly make some misrepresentations. Is there any case in the insurance field that deals with the insurance company and its agents, such as you have here? The Fitzgerald case, of course, deals with Chevrolet and its agents. The Kennedy case, again, is a RICO case that finds that there's no enterprise in that case either. The cases in the Ninth Circuit that talk about enterprise is the Odom case, and that's the case with Microsoft and Best Buy. But there's not really anything in the Ninth Circuit that's comparable to these kinds of situations. All of the Seventh Circuit cases, though, the Fitzgerald case, which is the Chevrolet case, the Emory case, and I think Crichton case, talk about having there to be a separate and distinct enterprise. And it's not necessarily the relationship between the parties. It's whether there's a separate and distinct enterprise. And just for a moment, I'd like to talk about the Odom case. In that case, Microsoft sold software through Best Buy. And if the case had been that Microsoft sold its software through Best Buy and there was some kind of misrepresentation in connection with that, that would not be an enterprise, a separate and distinct enterprise. The reason there was an enterprise in that case is because there was something separate and distinct from the two entities simply doing their business. For example, so they had these trial software. When Best Buy gave the trial software to the purchasers, it scanned their debit and credit cards. It gave that information to Microsoft. Microsoft then used it to continue their contracts when they hadn't actually entered into them. So there was something separate that was very different from then just selling the products, the two entities doing what they were supposed to be doing. So here we have Equitrust selling its deferred annuities, the licensed agents selling those deferred annuities. We have nothing else. And the cases are pretty unanimous under those circumstances that there's no separate and distinct enterprise. Council, could I ask you two questions? One, looking at the disclosure form, it's ER, well, LR 1634, I'm sure you're familiar with it. It says on the premium bonus, this contract offers a premium bonus equal to the premium paid in the first year multiplied by 10%. The premium bonus is allocated to the accounts proportionately in the same manner as your premium allocation instructions. Now, from that statement, I note that it goes on and describes the market value adjustment, and there is a separate piece of the ER 516 that goes in great detail and explains, as you said, the MBA. Where would the person looking at this be able to determine that there would be this recoupment that counsel is saying makes the bonus statement misleading and a half-truth? Your Honor, first of all, there is no recoupment. There is the policy promise or the promises, which are that, and this disclosure says exactly that, the 10% premium bonus will be allocated to the accounts in exactly the same way as the premium. That's what was promised, and that's what was done. After that, there are rates that are promised, and those are, they have minimum guaranteed rates, and after that, it's discretionary. Also in this disclosure, it says, other than the minimum guaranteed rates, there are no other promises. So you could, then Harrington could have gone and looked through the allocation formula or the process and determined that there would have been reduction or whatever your policy calls a bonus would, in fact, be amortized back or back down to zero? No, Your Honor. What he would be able to determine is that the premium bonus would be treated just like his premium allocated to the account, that the credited rates would be applied just like they're supposed to be applied by the contract, and that those rates have certain minimum guarantees, and after that, they're at the discretion of the company. So the bonus is never amortized or removed. It's just that you pay a lesser rate of interest in your discretion on this account than you might on an account with no bonus, right? It's possible that a lesser rate of interest, yes. If the market goes up. Yes. If the market goes down, you pay maybe a higher rate of interest than you might have. Well, yes, Your Honor. And it also depends on a lot of other things. What are the competitors paying? What's the market doing? What are interest rates doing? This discretionary rate is not, it doesn't have much to do with the bonus at all. It has to do with a lot of other things in terms of how the company is doing on its investments, what its competitors are paying, et cetera. So it is, the amount of the bonus is really a very small factor in the discretionary rates. Thank you. Oh, sorry. My second question was that you've challenged the costs allocation, and you're asking that, what, that we remand to the district court for reconsideration of that? Asking the district court to find that we are the prevailing party in this case and award us our appropriate costs. Now, your argument is that the district court failed to explain the rationale for the denial of costs, and that in itself is reversible error? Yes. Yes, Your Honor. But you concede the district court could, in its discretion, not award costs. That's true. The court could do that if it had some viable reasons. Could we exercise that discretion on behalf of the district court? If there – if it would be an abuse of discretion not to award costs to Equitrus, then, yes, Your Honor, you can exercise that discretion, because there's no discretion to exercise. Very well. Thank you, counsel. Your time has expired. The appellant's counsel has some reserved time, about a minute and a half. Mr. Berman. Thank you, Your Honor. First, I'd like to answer the question you asked, Your Honor. Is there anything in the record about what happens over time between a product with a bonus and without, and there's a table? No. That wasn't the question I asked. I know the answer to that, and I've read the record. I was asking about the – whether the market value adjustment ever, in effect, the lines ever crossed so that the basic statement was misleading, that if interest rates go down, your value's adjusted up, and if interest rates go up, your value's adjusted down. Okay. I thought you'd asked another question, which was, is there anything in the record about what happens to the value of the policy in a bonus and a non-bonus product? And at ER 2336 to 2337, paragraph 67, there's a table that compares what happens to those two products, and you'll see in year 8, the accumulated value in the bonus product becomes less than the accumulated value in the non-bonus product. Right. And I understand that under some circumstances, the non-bonus product is a better deal. Counsel made a statement that the bias factor is generally favorable for consumers. I would point out that this is a case brought on behalf right now of Mr. Harrington, and at paragraph 95, ER 2351, there's a calculation by the expert that shows that without the bias, Mr. Harrington's cash surrender value would have increased by $18,000. I think that's a material amount of money, and I don't think there's any way a consumer reading that formula would understand the effect. And finally, you asked about RICO cases and insurance agents. Are there any cases out there? There are some cases on point. One is MIGLIACCIO, which is cited in our brief. And the other is Western World Travel versus AMR. We think those are both on point. It's the use of agents for a common purpose in which courts have found a RICO enterprise, as did the courts that considered similar policies in the district court, namely the McGrath case and the Eurero case and the National Western case. Thank you, counsel. Do you disagree with counsel that it should go back, at least go back, for the court to state the reasons for denying costs? I do disagree. I think the court had discretion and exercised it. Okay. But the court never expressed the rationale? The court did not. Very well. Your time has expired, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Fisher, Hurwitz